877 So.2d 216 (2004)
STATE of Louisiana, Appellee,
v.
Damien Delynn UPDITE, Appellant.
No. 38,423-KA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 2004.
*218 Larry English, Shreveport, for Appellant.
Paul J. Carmouche, District Attorney, Eddie Brossette, J. Thomas Butler, Assistant District Attorneys, for Appellee.
Before BROWN, PEATROSS and MOORE, JJ.
MOORE, J.
Damien Delynn Updite was charged by bill of information with illegal use of a weapon, La. R.S. 14:94 E, and armed robbery with the use of a firearm, R.S. 14:64 and 64.3, arising from a robbery and high-speed chase through east Shreveport. After a four-day trial, the jury found him guilty as charged. The district court imposed concurrent sentences of 5 and 15 years at hard labor without benefits on the respective charges. Updite now appeals, urging the evidence was insufficient to support either conviction. For the reasons expressed, we affirm.

Factual Background
The incident began at Gator Car Wash, a self-serve carwash on Sand Beach Drive, just off Youree Drive, about 10:30 on the night of December 13, 2001. The victim, 18-year-old Robbie Madison, was in the farthest stall, washing mud from the undercarriage of his 1997 GMC Sierra truck. He testified that from the corner of his eye, he espied someone running up and brandishing a pistol. The assailant, a young black man dressed in a white hooded sweatshirt with the hood pulled over his head and a yellow bandana tied over his nose and mouth, put the gun to his chest, ordered him to lie on the ground and demanded all his money. Getting a good look at the gun, Robbie described it as a black .45 cal. semi-automatic pistol. Robbie told his assailant that all his money and credit cards were inside the truck. After showing some indecision, the assailant let Robbie open the door and take out a $5 bill, which was all the cash in the truck, and some credit cards. Robbie testified that the assailant refused the credit cards and took the cash, but acted annoyed that there was not more money. The assailant then asked for Robbie's truck keys, and threatened to kill him, but refused to take the keys. The assailant started to walk away, but after another instant of indecision, turned around and handed back Robbie's $5 bill. Robbie testified that he stood there, totally startled, until he noticed the assailant jumping into the passenger seat of a brown Honda Accord parked a few stalls down.
As the assailant drove off, Robbie felt that a "person like that should be off the streets." Admitting it was a "stupid thing to do," he decided to try to catch him. Robbie hopped into his pickup and started to pursue the Accord, which had turned onto Sand Beach, and followed it in a high-speed chase up Youree Drive. Robbie testified that he never got closer than 50 yards behind the Accord, which was speeding, swerving, cutting corners and running red lights. On a residential street, the assailant leaned out his window and fired three or four shots at the pickup; Robbie could see the muzzle flash and did not realize a bullet had struck his front passenger side tire. Robbie honked his horn and flashed his emergency lights in the hope of attracting the police.
The Honda turned off Youree and went into a subdivision near Querbes golf course, driving in what Robbie called a "sporadic" manner. Trying to make a sharp turn off Cornwell Avenue onto East Fairview Street, the Accord skidded, crashed into the curb and came to a stop. Robbie pulled his truck about 30 yards behind the Accord and saw both its occupants get out and run. At this point he *219 noticed that an unmarked police car had joined the chase and stopped behind him.
Officer Menefee testified that the Accord and the GMC truck had run a red light and passed him on Youree Drive doing 90-100 mph; he followed them, radioed for assistance, and when the Accord crashed, he saw two black men get out and run west on East Fairview. When Robbie told him one of the men had robbed him at gunpoint, Officer Menefee shouted at them to stop, but they kept running. The officer pursued them on foot through several yards and over a fence but soon lost sight of them. Other officers continued to search until they learned the suspect had turned himself in at the station.
Corporal Van Zandt located four .45 shell casings on the street in the 4300 block of Finley Drive, a short distance south of the crash site. From their placement, he felt they had been fired from a fast-moving vehicle. After the Honda was impounded, Cpl. Van Zandt took several photographs of it. These depict two small, streaking dents in the right rear quarter panel, which Cpl. Van Zandt felt were caused by bullets fired from the passenger window at an object behind the car, and a slightly larger dent in the right front quarter panel, which Detective Brown ascribed to the impact with the curb. Detective Brown traced the Honda's tags to a Mrs. Bogan in Bossier City, who said her daughter's boyfriend, Damien Updite, had been driving the car.
Around midnight, Updite appeared at the police station with a .45 cal. Hi-Point revolver to report that he had fired some shots in self-defense. He testified that he had driven his fiancee's car that day; after an evening of drinking, he and his friend Lamar Smalls stopped at Gator Car Wash to clean it out. While they were there, a white man washing a white pickup truck approached him and asked if he knew where to buy some "weed." Updite said he did not know; the white man badgered him and called him a racial epithet. Taking offense, Updite argued with him and struck him in the face, knocking him down. Even though they had not finished cleaning the Accord, Updite got in the passenger seat and Smalls drove off. They soon noticed, however, that the white pickup was charging behind them at a high rate of speed, flashing its lights and honking its horn, and trying to run them off the road. According to Updite, the truck rammed their rear bumper at least twice, and on several occasions rode up alongside and tried to ram them off the road. Updite then pulled the handgun he kept in the Accord's side panel, firing two shots into the air and two at the ground, in an effort to scare off the truck, but the driver continued to pursue them. Updite testified that the Accord struck a curb near the golf course and broke its axle, so he walked to his mother's house about two blocks away on East Ratcliff. He stressed that he walked this distance because he has a bad knee and asthma. Having giving the police his account, Updite was arrested.
After determining that Updite was not intoxicated, Detectives Brown and Hinderberger asked him to waive his Miranda rights and give a recorded statement; he agreed. On the tape, which was played twice at trial, Updite did not mention hitting Robbie at the car wash. The detectives confronted him about inconsistencies in his story; feeling he had turned belligerent, they terminated the statement. At trial, Detective Brown elaborated: there was no physical evidence that the truck rammed the rear bumper of the Accord; despite Updite's claim that he had been drinking all day, there was no smell of alcohol on his person and no alcohol bottles in the Accord; and Robbie gave an excellent description of the handgun which, according *220 to Updite, had not been pulled until deep into the chase and was fired at high speed.[1]
Detective Brown testified that as they were leaving the room, Updite said, "How are you going to charge me with armed robbery when I gave him his five dollars back?" Updite, however, testified that what he really said was, "How can I be under arrest for armed robbery if he said I gave him the money back?"
On the evening of December 14, Detective Brown prepared a photo lineup from which Robbie selected Updite's picture. Robbie identified, as the weapon used in the robbery, the Hi-Point .45 caliber semi-automatic handgun that Updite carried to the police station. He also identified, as the white hooded sweatshirt worn by the robber, the sweatshirt officers received from Updite's mother. No yellow bandana was ever recovered. Robbie also gave police the bullet that had lodged in his front right tire. The crime lab determined that this bullet had been fired from, and the shells recovered on Finley Drive had been ejected from, Updite's Hi-Point .45.
As noted, Updite was charged with illegal use of a weapon and "armed robbery with the use of a dangerous weapon."[2] Jury trial was held over four days in April 2003. The witnesses testified as outlined above. In addition, Updite's mother, Evelyn Khelama, testified that when he came home about 11 pm that night, he related that a guy had tried to buy drugs from him, called him a racial epithet, and tried to run him off the road. After hearing this, she suggested that he call the police. Lamar Smalls, who was driving the Accord that night and was the only other potential eyewitness, did not testify.
The jury found Updite guilty as charged on both counts. The district court denied his motion for post-verdict judgment of acquittal and sentenced him to concurrent terms of five years at hard labor without benefits for the illegal use of a weapon and 15 years at hard labor without benefits for armed robbery with the use of a firearm. Both sentences are the statutory minimum. Updite now appeals, urging by four assignments of error that the evidence was insufficient to support the convictions.

Discussion: Proof of the Offenses
By his first two assignments, Updite urges the evidence is insufficient to prove the essential elements of the offenses. He argues that the victim's account of the incident at the carwash was completely incredible, as nobody who had just been robbed at gunpoint and forced to lie on the ground would suddenly decide to protect the public by pursuing his robber in a high-speed chase, continue despite a volley of gunfire, and not stop "until police interrupted the chase." He also argues that the victim's account does not square with the physical evidence, as nobody could lean out the passenger window of a car driving 75-100 mph, aim at a vehicle that was 75-100 yards behind him, and "with a .45 caliber weapon shoot the opposite tire on the Madison vehicle" (emphasis added). Finally, he contends that the victim could not have picked his photo out of the lineup, when according to the victim's own account, the assailant's head was covered with a white hood, and his face with a yellow bandana (which was never recovered). Updite concludes that the victim's credibility issues, coupled with the *221 physical inconsistencies, ndermine the verdicts and mandate an acquittal.
The standard of appellate review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The Jackson standard applies both to direct and circumstantial evidence. State v. Marcantel, XXXX-XXXX (La.4/3/02), 815 So.2d 50. In State v. Davis, XXXX-XXXX (La.6/27/03), 848 So.2d 557, the supreme court reiterated:
[T]he task of an appellate court reviewing the sufficiency of the evidence is not to second-guess the credibility choices of the trier of fact "beyond * * * sufficiency evaluations under the Jackson standard of review." State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983). A victim's or eyewitness's testimony alone is therefore usually sufficient to support a verdict. State v. Bright, 98-0398, p. 24 (La.4/11/00), 776 So.2d 1134, 1148 [additional citations omitted].
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27; State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64 A. When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned for an additional period of five years without benefit of parole, probation or suspension of sentence, consecutive to the sentence imposed under R.S. 14:64. La. R.S. 14:64.3 A.
Illegal use of weapons or dangerous instrumentalities is, inter alia, the intentional or criminally negligent discharging of any firearm where it is foreseeable that it may result in death or great bodily harm to a human being. La. R.S. 14:94 A. The sentence for this offense is enhanced when it is committed "by discharging a firearm from a motor vehicle located upon a public street or highway, where the intent is to injure, harm, or frighten another human being." R.S. 14:94 E; State v. Joubert, 97-1093 (La.App. 3 Cir. 2/4/98), 705 So.2d 1295, writ denied, 98-1525 (La.10/30/98), 723 So.2d 973.
The evidence of the armed robbery consisted of two divergent accounts of the incident at the carwash. Robbie testified that Updite accosted him, held him at gunpoint, and demanded his cash, credit cards and truck keys; Updite took only the cash, and then returned it before fleeing the scene. Updite maintained it was Robbie who initiated the contact, asking him where to buy marijuana and calling him by an offensive racial epithet; as they scuffled, Updite hit him in the face and *222 knocked him to the ground; Updite then calmly left. The jury accepted Robbie's version, and we find no basis to disturb their credibility assessment. While it may seem unusual for an armed robber to return the cash he has just taken from his victim, Robbie described his assailant's acts as "sporadic"; the frustration of netting only $5 in a robbery may reasonably explain his indecisive reaction. Notably, Robbie gave an excellent description of the black.45 caliber semi-automatic weapon which, according to Updite, was still in the Accord at the time. Robbie did not mention getting punched in the face or knocked to the ground, he did not report this to the police, and none of the officers noticed any bruising or scratches on his face. On this evidence, the jury was entitled to discount Updite's account of the events at the carwash.
The evidence of illegal use of weapons included not only the parties' divergent testimony but also physical evidence. The photographs, particularly exhibits S-6a and 6b, show two fresh streak-shaped dents near the passenger side brake light of the Accord. These images are consistent with Robbie's testimony that Updite leaned out the passenger window and fired his gun at the pickup, but the bullets grazed the back of the Accord  a point Updite admitted on cross examination. Moreover, the evidence does not support Updite's argument that the bullet struck the "opposite tire on the Madison vehicle." Both Robbie and Officer Menefee testified that the front right tire was flat, which we interpret as the passenger side tire. This damage is also consistent with Robbie's account of the high-speed shootout. The jury was plainly entitled to accept Robbie's version.
Taken in the light most favorable to the state, the evidence proves beyond a reasonable doubt that Updite committed every element of both charged offenses. These assignments of error lack merit.

Self-defense
By his third assignment of error, Updite urges the jury should have found he acted in self-defense when he fired at the victim. By his fourth assignment, he contends the district court should have granted his motion for post-verdict judgment of acquittal. He argues that even by his accuser's own account, he was being pursued at a high rate of speed and bumped by the Accord several times. Updite contends this was a hostile demonstration or overt act which created, in his mind, the belief that he was in immediate danger of losing his life or suffering great bodily harm. State v. Miles, 98-2396 (La.App. 1 Cir. 6/25/99), 739 So.2d 901, writ denied, 99-2249 (La.1/28/00), 753 So.2d 231. He concludes that on this evidence, the state did not meet its burden of disproving his claim of self-defense. State v. Scott, 31,379 (La.App. 2 Cir. 10/28/98), 720 So.2d 415, writ denied, 99-0170 (La.5/14/99), 741 So.2d 664.
Self-defense is defined by La. R.S. 14:19:
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
The standard of proof when a defendant claims self-defense in a non-homicide case is a preponderance of the evidence. State v. Freeman, 427 So.2d 1161 (La.1983); State v. Braswell, 605 So.2d 702 (La.App. 2 Cir.1992). The state *223 must then prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326. The issue of self-defense requires a dual inquiry, an objective inquiry into whether the force used was reasonable under the circumstances and a subjective inquiry into whether the force was apparently necessary. State v. Robinson, 37,043 (La.App. 2 Cir. 5/14/03), 848 So.2d 642, and citations therein. A person who is the aggressor or who brings on the difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21; State v. Robinson, supra.
Although Robbie's decision to chase an armed robber was impulsive and unwise, it was not implausible given the pressure of the moment and the understandable belief that his assailant should be "off the street." The physical evidence  particularly the bullet marks to the Accord  supported Robbie's claim that he was behind the Accord, albeit at high speed. Robbie testified he made no physical contact with the Accord, and Officer Menefee saw no contact during the second half of the chase. Although no expert testimony was offered, the photographs of the Accord's rear bumper simply do not show the kind of damage that could be expected from a high-speed impact with an 8,000-lb. truck.[3] On this record, the jury could reasonably find that Updite did not show, by a preponderance of the evidence, that he acted in self-defense. Neither an objective inquiry into whether the force used was reasonable, nor a subjective inquiry into whether it was apparently necessary, will support Updite's contention that he acted in self-defense by firing several shots at his pursuing, yet apparently unarmed, victim. State v. Robinson, supra. These assignments lack merit.

Conclusion
We have reviewed the entire record and find nothing we consider to be error patent. La. C. Cr. P. art. 920(2). For the reasons expressed, Damien Delynn Updite's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] Detective Hinderberger was not available to testify. At the time of trial, he was on active duty in the Army Reserves in Guam.
[2] The offense is actually armed robbery with the use of a firearm. La. R.S. 14:64.3. The use of a dangerous weapon is an element of any charge of armed robbery.
[3] At most, the photographs show even, environmental wear along the edge of a slightly loose bumper.