Judgment rendered June 30, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,975-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JOHN WALKER                                 Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 355071

Honorable Katherine Clark Dorroh, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Douglas Lee Harville

JAMES EDWARD STEWART, SR.            Counsel for Appellee
District Attorney

JASON WAYNE WALTMAN
TRINICIA S. LEONARD
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and ROBINSON, JJ.

STEPHENS, J., dissents with written reasons.

**ROBINSON, J.**

After waiving his right to a jury trial, John Walker was convicted as charged of second degree battery in violation of La. R.S. 14:34.1. Walker was sentenced to five years at hard labor, which was suspended, and placed on three years of probation. He was also ordered to pay court costs and a $50.00 fee to the public defender's office; he would be sentenced to 30 days in jail for failing to pay.

Walker has appealed his conviction. We affirm his conviction. However, because his sentence is illegally lenient, we vacate his sentence and remand the matter to the trial court for resentencing.

**FACTS**

Walker was charged by bill of information with second degree battery in violation of La. R.S. 14:34.1. More specifically, he was charged with one count of committing a battery and intentionally inflicting serious bodily injury on Terrence Morris without his consent.

A bench trial was held on July 23, 2020. Morris was the first witness called by the State. He testified that on July 20, 2017, he had been hanging out since that morning at the home of Keith Felton ("Keith") on Merwin Street in Shreveport. Morris's home, on Emery Street, was directly behind Keith's home. A trail ran from one block to the other next to their homes.

Morris recalled that at around 9:00 or 10:00 that evening, Walker arrived and started talking to Keith. After their conversation was finished, Morris began talking to Walker about helping him obtain a job. Morris thought Walker was becoming frustrated by their discussion about his employment prospects. According to Morris, Walker jokingly demonstrated what he would do if they ever fought.

Morris described himself as very intoxicated on July 20. He estimated that he drank more than five 24-ounce beers that day. Morris was weaving back and forth because of his state, which he thought Walker noticed. When Morris asked Walker for some of his beer, Walker gave him $2 to buy his own at a nearby store. They had a few more words and then Morris left for the store. It was then around 10:00 according to Morris.

As Morris began walking down the street to the store, he looked back to see Walker remove his shirt and change his shoes while standing next to his vehicle. Morris testified that after he had walked past five houses to reach near the end of the block, Walker came after him and began hitting him. Morris estimated that he was hit 40 times, including to the face. The fight, which occurred entirely in the street, was stopped by Keith. Morris insisted that he did not hit Walker and was unable to stop him. Morris also claimed he blacked out during the fight. Morris sustained a fractured jaw on both sides. He was taken by ambulance to the hospital. A metal brace was inserted before he underwent day surgery in August. He still has cramps and trouble sleeping because of his injuries.

On cross-examination, Morris testified that he left immediately after the fight was over and returned to his home. His brother Vincent and some of Vincent's acquaintances were on the porch. Morris claimed that he did not say anything to Vincent but went directly inside to check himself in a mirror. After Vincent inquired about the cause of his injuries, Vincent left for Keith's home. Morris denied that he went home to get his brother. Morris followed his brother to Keith's home, but maintained that he did so to make sure Vincent did not do anything crazy. He denied that he returned to fight Walker again. Morris claimed that although Walker may have

2

thought Vincent went there to jump him, his brother actually went there to talk to Walker. Morris testified that although Walker pushed his brother down twice, he did nothing when they got there or to help his brother. Morris claimed that he did not see a second fight and was involved in only one fight with Walker. Morris denied ever hitting Walker, claiming that he was too intoxicated to fight. Morris also denied ever biting Walker.

Morris could not recall during cross-examination what Walker said just before the fight. However, on redirect, Morris testified that Walker said, "Bitch, I'll kill you" before he threw the first punch. Morris also testified that when he thought Walker was becoming too aggressive during their conversation, he may have said something "out of line" about a prior incident when Walker backed down from fighting someone else. Morris believed Walker was set off by his comment.

Corporal Vincent Webb from the Shreveport Police Department went to Morris's home that night to investigate a call about a battery. He took photos of Morris. Corporal Webb described Morris's condition as "pretty bad." His jaw looked broken and his eye was in bad shape as well. No injuries were observed on Morris's hands.

Detective Logan McDonald was assigned to the violent crimes unit with the Shreveport Police Department. He interviewed Morris on August 9, 2017. Detective McDonald testified that Morris told him that he thought that he and Walker were joking until he walked away and Walker followed him and attacked him. Morris did not tell the detective that he tried to hit back at Walker. The detective did not recall Morris mentioning that he blacked out during the fight. Morris also never mentioned his brother to Detective McDonald. Morris's face was still extremely swollen, he could

3

barely talk, and appeared to be in pain. His jaw was also wired partially shut. An arrest warrant was obtained after Morris identified Walker in a photo lineup. Detective McDonald did not get a statement from Walker following his arrest because he was busy working on other cases and did not have a chance to get to the jail before Walker went through jail clearance.

Detective McDonald interviewed only Morris about the incident. Morris could not name any witnesses and no witnesses came forward. According to Detective McDonald, if a witness had called the Shreveport Police Department, he would have received a message from the person who took the call. He would have returned the call, set up an interview, and obtained a recorded statement.

After the State presented its evidence, Walker testified. His then-fiancée and current wife is Britisheandrea Eason-Walker ("Eason"). Walker worked for himself maintaining lawns and cutting down trees. Walker testified that he went to Keith's house around 7:00 as it was just getting dark. He spent time at Keith's house every day because Keith sold barbecue and people would hang out in his yard.

Walker recalled that Morris was sitting on the porch when he started talking to Keith and a neighbor. Walker had a 40-ounce bottle of beer with him. Morris walked up and asked for some of his beer. After Morris reached for his beer and then asked for some money, Walker gave him $2 so he could get his own beer and would stop harassing Walker. Morris then turned around and walked out of the yard. In the meantime, Eason went to their truck to roll a blunt. After Walker resumed his conversation with Keith, Eason called to Walker and told him to see what Morris wanted with him. He turned his attention to Morris, who was beckoning him to come

4

down the street. Walker thought Morris needed additional money, so he met him halfway down the street. Walker testified that Morris told him, "Say, man, you been wanting to try me?," and hit him in the mouth. Walker claimed this punch chipped his teeth.

Walker insisted that Morris hit him first. Walker explained that he tried to catch Morris, who was steadily throwing punches and hit Walker twice. Keith came down the street and urged Walker to stop fighting. Walker told Morris to go home and then walked back to Keith's home. Walker stated that Morris followed him all the way to Keith's yard and said he was going home to get a gun. Morris then left along the trail next to Keith's home. Walker denied that he ever changed his clothes as described by Morris.

Walker testified that about four minutes after he returned to Keith's yard, he heard a commotion as Morris, Morris's brother ("Dee"), another guy, and a female came up the trail. When Dee asked who had hit his brother, Walker told him, "Dee, man, don't walk up on me. Your brother hit me first. Go talk to your brother." Walker recalled that he pushed Dee to the ground because Dee continued to "walk up" on him. When Dee got off the ground and charged him, Walker pushed him two or three times. After the last push, Morris came around the corner of the house and hit Walker in the mouth, so they started fighting again. Walker explained that he was fighting Morris and Dee at the same time. When he knocked Morris to the ground with a solid punch, Morris grabbed his right leg and bit it. Morris continued to bite him until he struck Morris once. Morris released his bite, and at that point, Keith stepped in and told everyone to get out of his yard.

5

Walker drove home after the fight. He testified that he had no idea of the severity of Morris's injury. Walker thought he was done with the matter until a friend saw on the television news that he had an outstanding warrant. Walker claimed that the next morning he called the detective's office but was told there was not a case against him.

Walker admitted on cross-examination that he was convicted of aggravated assault in 2000, illegal possession of stolen things in 2003, simple battery in 2005, flight in a vehicle in 2008, and resisting a police officer with force or violence in 2010. Walker denied Morris embarrassed him when Morris mentioned the time that Walker had backed down. Walker also denied that he followed Morris out of the yard, but claimed that Morris beckoned him to the street with hand motions. He had no medical records to corroborate that his teeth had been chipped. Walker also testified that his wife called the police multiple times after his face was shown on the television news.

Britisheandrea Eason-Walker ("Eason") estimated that they arrived at Keith's house early in the evening. She testified that as she and Walker went up to the porch to greet everyone there, Morris approached Walker and tried to grab his beer. Walker pushed Morris's arm back, told Morris not to do that, and said he would get Morris a beer if he needed one. Morris stayed on the porch for a little while, then got up and tried to grab Walker's beer a second time. Walker pushed Morris back and said he would give him $2 to buy a beer. After Walker gave $2 to Morris, he also gave Morris an extra dollar to make sure that he had enough to purchase a beer. Morris walked away but then turned around. When Eason went to Walker's truck to put her food away, she heard Morris calling Walker out of the yard. Morris said,

6

"Hey, man, come here." She told Walker to talk to Morris and then to come right back. She then watched Walker leave to see what Morris wanted. The last thing she saw was Walker and Morris talking as they walked down the street. By the time she returned to the porch, she learned that Walker and Morris were fighting. She could only see figures in the dark moving. They stopped fighting and walked back to the yard when Keith told them to stop. She heard Walker and Morris continue to exchange words. She did not know who threw the first punch.

She recalled that after they returned to Keith's yard, Morris left down an alley. She thought Morris looked fine and only had a couple of bruises from the fight. Around 5-10 minutes later, Morris's brother, a cousin, and a female arrived. The brother wanted to know who fought with Morris, but then calmed down when he learned it was Walker. As the brother tried to talk with Walker, Morris appeared and acted as if he had a weapon. The second fight started when Morris "ran up" on Walker. Eason claimed that Morris started the second fight even though she could not see who threw the first punch. As Morris and Walker fought again, the brother and Keith stopped the fight. Eason witnessed Morris bite Walker on the right ankle when he was knocked to the ground after Walker hit him once. She testified that the bite did not leave a mark that she could see afterward. Following this second fight, Morris's brother helped him home and Keith told everyone to leave. She never saw Walker change clothes while at Keith's house.

Eason testified that she called the Shreveport Police Department three times after learning the police were looking for Walker. She was told there was no record of a charge or a report with his name. She has never spoken

7

to a detective or an investigator from the District Attorney's Office. Eason acknowledged that Morris was really drunk that evening.

Keith Felton ("Keith") testified there were always gatherings at his home, including on the date of the incident. He did not know when Walker arrived that day. He saw Walker give a dollar to Morris. Walker gave another dollar to Morris after Keith told Walker that a beer could not be purchased for a dollar. He heard Walker and Morris say something, although he did not know what was said, then they both walked off the porch. Keith recalled seeing them walk away while talking. He did not know who started the fight. Keith testified that Walker and Morris fought down his street, and he told them to stop. He was unable to discern if either one of them was injured because it was nighttime.

Keith recalled that Morris returned after the first fight with his brother and another male. Keith testified that the brother was "running up" on Walker, who kept pushing the brother off of him. He further testified that "both of them did run up on him, but he kept just pushing his brother off of him[.]" Keith told them to stop and to get out of his yard. They eventually stopped and left. Keith told the court that the police came that night and asked him what had happened. Keith did not know anything about Morris biting Walker.

On cross-examination, Keith was asked if he observed Walker walk after Morris. He replied, "No, I seen them walking down the street. They was talking and walking." However, he answered in the affirmative when he was later asked if he testified that Walker started walking down the street shortly after Morris left Keith's house. He stated they were walking together

8

down the street.  He did not know how many beers were consumed by Morris, but he did not consider Morris to be "falling down sloppy drunk."

Lena Felton ("Lena") is the wife of Keith Felton.  She saw Morris put his hand in Walker's face.  Walker's reaction was to say, "Go on on me.  Go on on with that."  Morris uttered a few curse words at Walker, left the yard, and started walking down the street.  However, he stopped walking, turned around, and began gesturing for Walker to meet him in the street.  Lena testified that she could not see the fight.  She recalled that after Walker returned to her yard, Morris came back through the alley "with the same stuff."  He was accompanied by his brother, a cousin, and a female.  Walker left the yard and they "got into it" again, but all she could see was her husband trying to stop them.  Lena admitted that she only heard Morris run his mouth and never saw him punch Walker.

Robert Montgomery has known Morris for four or five years.  He was familiar with Morris's general character because Morris had gotten into a couple of fights with his friend.  Montgomery testified that although Morris was not regarded as a bully, he was known around the neighborhood to be a little hostile at times.

After the defense rested, Morris was called as a rebuttal witness.  He denied having a gun with him or hitting Walker in any way, even in a joking manner.  He also denied beckoning Walker to come out to the street to fight him.  He claimed he did nothing that would have indicated to Walker that he wanted to fight him.  Morris testified that he was in no condition to fight because his intoxication level was a "10" on a scale of 1-10.

Medical records introduced into evidence showed that Morris was diagnosed at University Hospital-Shreveport on July 20 with a fracture of

the right mandible, a fracture of the left mandible, and alcohol abuse with intoxication. He had been transported to the hospital by EMS. He underwent jaw surgery on August 3.

Walker was convicted as charged of second degree battery. Walker's motions for post-verdict judgment of acquittal and new trial were denied. He was sentenced on September 2, 2020. The court noted that the offense was a crime of violence, but wanted the minutes to reflect that Walker would be sentenced as if second degree battery were not a crime of violence, upon recommendation by the State. Walker was therefore subsequently sentenced to five years at hard labor, with the sentence suspended. Walker was placed on three years of supervised probation. Walker was also ordered to pay court costs and $50.00 to the public defender's office. He was advised by the court that if he failed to pay, he would be ordered to serve 30 days in jail. The trial court explained that the above sentence was imposed because both the victim and Walker had been drinking, but also noted that Morris's injuries were significant.

Walker filed an untimely motion for appeal that was granted by the trial court. His counsel argues on appeal that Morris was not a credible witness because he failed to disclose that a second altercation occurred, which raised reasonable doubt as to his version of the events. Moreover, his counsel notes that the State failed to call Morris's brother and the others involved in the second incident as witnesses. Thus, his counsel argues that had the complete story been told, it would hardly prove the specific intent necessary to convict Walker of this crime. His counsel further argues that Morris's story was self-serving and that Walker was forced to defend himself from attacks by both Morris and his brother.

10

The State counters that testimony from witnesses coupled with Morris's medical records proved that Morris sustained significant injuries and that Walker intended to cause those injuries when he pursued Morris down the street.

**DISCUSSION**

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/06/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331. A reviewing court affords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156; *State v. Broadway*, 53,105 (La. App.

2 Cir. 1/15/20), 288 So. 3d 903, *writ denied*, 20-00372 (La. 7/24/20), 299 So. 3d 78.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Green*, *supra*; *State v. Glover*, 47,311 (La. App. 2 Cir. 10/10/12), 106 So. 3d 129, *writ denied*, 12-2667 (La. 5/24/13), 116 So. 3d 659. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 16-1479 (La. 5/19/17), 221 So. 3d 78; *State v. Gullette*, 43,032 (La. App. 2 Cir. 2/13/08), 975 So. 2d 753. Such testimony alone is sufficient even where the State does not introduce medical, scientific, or physical evidence. *State v. Larkins*, 51,540 (La. App. 2 Cir. 9/27/17), 243 So. 3d 1220, *writ denied*, 17-1900 (La. 9/28/18), 253 So. 3d 154. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on the fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000).

Battery is the intentional use of force or violence upon the person of another. La. R.S. 14:33. Second degree battery is a battery when the offender intentionally inflicts serious bodily injury. La. R.S. 14:34.1. Serious bodily injury is bodily injury which involves unconsciousness;

12

extreme physical pain; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death. La. R.S. 14:2(C).

Second degree battery is a specific intent crime; therefore, the evidence must show that the defendant intended to inflict serious bodily injury. *State v. Fuller*, 414 So. 2d 306 (La. 1982); *State v. Jackson*, 51,575 (La. App. 2 Cir. 9/27/17), 244 So. 3d 764. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Broadway*, *supra*; *State v. Jackson*, *supra*. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of this determination is to be guided by the standards of *Jackson v. Virginia*.

To convict a person of second degree battery, the State must prove the following elements beyond a reasonable doubt: (1) the commission of a battery; (2) the battery resulted in serious bodily injury; and (3) specific intent. *State v. Jackson*, *supra*. The State met its burden in this case.

Battery is the intentional use of force or violence upon the person of another. La. R.S. 14:33. There is no dispute that at least one fight occurred where Walker punched Morris. The evidence established that Morris sustained a fractured jaw on both sides, was required to temporarily wear a metal brace in his mouth, underwent surgery to repair his jaw, and still suffers effects from his injury.

13

The evidence showed that Walker and Morris had engaged in a heated conversation and Morris, in his intoxicated state, provoked Walker with his words, but walked away. The evidence also showed that Walker approached Morris after he left Keith's home, presumably because he was upset with something Morris said to him. Morris was already several houses up the street at the time. While no one saw who threw the first punch, it is clear that Walker inflicted significant injuries on Morris during their fight. Walker testified that he suffered a bite and chipped teeth while fighting with Morris, but no evidence corroborated his self-serving story. These facts show that Walker specifically intended to cause serious bodily injury to Morris and in fact caused significant injuries to Morris.

Walker's counsel maintains that because Morris neglected to testify during direct examination about confronting Walker after the first fight, Morris did not tell the full story of what happened and there was at least reasonable doubt as to whether Morris sustained his injuries during the second fight. Walker argues that during this second fight he was forced to defend himself against an attack by Morris and his brother, which included Morris biting him.

In a non-homicide situation, a claim of self-defense requires a dual inquiry: first, an objective inquiry into whether the force used was reasonable under the circumstances; and, second, a subjective inquiry into whether the force used was apparently necessary. *State v. Broadway, supra*; *State v. Jackson*, *supra*. The burden of proving self-defense in a non-homicide case rests with the defendant to prove the defense by a preponderance of the evidence. *Id.*

14

Morris maintained that although Walker pushed his brother down twice, he did nothing to help his brother when he returned to Keith's yard after the fight with Walker in the street. Morris claimed that he did not see a second fight and was involved in only one fight with Walker. The trial court was in the best position to evaluate the credibility of the witnesses after listening to the testimony and observing their demeanor. The court obviously believed Morris's version of events and rejected any testimony to the contrary.

After viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime of second degree battery proven beyond a reasonable doubt. Accordingly, Walker's assignment of error is without merit.

### ERROR PATENT

Error patent review of the appellate record reveals that Walker's sentence is illegally lenient in two respects. First, the trial court suspended Walker's sentence for a crime of violence. La. R.S. 14:2(B) lists second degree battery as a crime of violence. Under La. C. Cr. P. art. 893, a court shall not suspend the sentence of a conviction for an offense that is designated in the court minutes as a crime of violence pursuant to La. C. Cr. P. art. 890.3, except a first conviction for an offense with a maximum prison sentence of ten years or less that was not committed against a family member or household member as defined by La. R.S. 14:35.3, or dating partner as defined by La. R.S. 46:2151. The period of probation shall be specified and shall not be more than five years. Because this was not Walker's first felony conviction, this exception does not apply.

15

However, art. 890.3 provides that the District Attorney may make a written recommendation to the court that the offense should not be designated as a crime of violence only for the following purposes: (1) the defendant's eligibility for suspension or deferral of sentence pursuant to art. 893; and (2) the defendant's eligibility for participation in a drug division probation program pursuant to La. R.S. 13:5304.

This record is devoid of any written recommendation from the District Attorney. However, the trial court indicated that the State was making the recommendation, to which the State agreed. Nothing in the statute or case law suggests that the court can make its own recommendation, which appears to be the case here. Accordingly, the sentence is illegally lenient. On remand for resentencing, the District Attorney may provide such written recommendation.

Second, the trial court sentenced Walker to default time in the parish jail in the event he failed to pay the fine or costs. An indigent defendant cannot be subjected to default jail time in lieu of the payment of a fine, costs or restitution. *State v. Malmay*, 52,824 (La. App. 2 Cir. 9/25/19), 280 So. 3d 947; *State v. Lewis*, 48,373 (La. App. 2 Cir. 9/25/13), 125 So. 3d 482. A defendant's indigent status in such a situation may be discerned from the record. *Id.* Where a defendant is represented at trial by the Indigent Defender's Office, or on appeal by the Louisiana Appellate Project, this Court has considered it error for a trial court to impose jail time for failure to pay court costs. *Id.*

In this matter, Walker's indigent status has been shown by his representation at trial by the Indigent Defender's Office and his current

16

representation on appeal by the Louisiana Appellate Project. Therefore, the imposition of default jail time was in error.

## CONCLUSION

For the foregoing reasons, Walker's conviction is affirmed. His sentence is vacated and the matter is remanded to the trial court for resentencing.

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.**

**STEPHENS, J., dissenting.**

I respectfully dissent from the majority's opinion, finding that the evidence, when viewed in the light most favorable to the prosecution, is insufficient to support the trial court's verdict of second degree battery.

Proving that Defendant had the specific intent to inflict serious bodily injury was an integral part of the state's case. The prosecution knew that evidence of the second altercation between the two men, which necessarily involved rebutting Defendant's claim of self-defense, would make the intent element more difficult to establish. Therefore, the state deliberately chose to limit Morris's testimony to the initial fight between the two men.

The very next questions asked by the state's attorney following Morris's testimony about the initial fight skipped over important events that occurred the night of the party at Keith Felton's house, i.e., the fact that Morris went home to get his brother and others, the second altercation, the participation of Morris's brother in the subsequent fight, and critically, the time delay in seeking medical treatment for Morris. The state's attorney instead focused on the victim's injuries—their severity, the treatment he received for them, and the lingering effects he experiences to date. Taken alone (since the state did not call as witnesses the additional people who were with Morris when he returned to the Felton home after the first fight *prior to* his seeking medical attention and treatment), the compelling and self-serving testimony of the victim, Terrence Morris, during the state's direct examination *could* support the trial court's finding that Defendant is guilty of battery.

However, the defense, through its cross examination of Morris and the direct examination of its witnesses, presented a more complete timeline of

1

the evening's events, particularly regarding the two violent interactions between Defendant and Morris. Mrs. Walker, Felton, and Defendant were consistent in their testimony regarding the first encounter between the two men, as well as the second altercation that occurred at a later time in a different location and involved Defendant, the victim, and the victim's brother. While the trial court obviously discounted the Walkers' testimony as self-serving, there was no evidence to suggest that Felton was a biased witness. Furthermore, there was no evidence to dispute that there were in fact two separate and distinct incidents, not one ongoing fight between Defendant and Morris. The first incident was instigated by Defendant, while the second confrontation was initiated by Morris. While Defendant had no valid claim of self-defense as to the first encounter, he was able to avail himself of that defense in the second one. However, I find that the record is devoid of any evidence whatsoever to establish that a second degree battery occurred in the first encounter. Second degree battery requires serious bodily injury. While a broken jaw is clearly serious bodily injury, the evidence, i.e., the victim's delay in seeking medical attention, and the nature of the injuries he inflicted during the second altercation—a bite to Defendant's leg—something Morris could not have done had his jaw been broken during the first fight, shows that his broken jaw occurred during the second fight.

As noted in the majority opinion, a defendant in a non-homicide case must prove self-defense by a preponderance. *See, State v. Broadway*, 53,105 (La. App. 2 Cir. 1/15/20), 288 So. 3d 903, *writ denied*, 20-00372 (La. 7/24/20), 299 So. 3d 78. However, at that time, the state must then prove beyond a reasonable doubt that the defendant did not act in self-defense.

2

*State v. Scales*, 93-2003 (La. 5/22/95), 655 So. 2d 1326; *State v. Updite*, 38,423 (La. App. 2 Cir. 6/23/04), 877 So. 2d 216, *writ denied*, 2004-1866 (La. 11/24/04), 888 So. 2d 229.

I find that the state failed to rebut Defendant's evidence of self-defense and also fell short of establishing the requisite elements required for a conviction of second degree battery. For these reasons I would reverse Defendant's conviction and sentence for second degree battery, find him guilty of simple battery, and remand this case so he could be sentenced for the crime of simple battery.